Steven C. Dawson, Bar No. 006674
Anita Rosenthal, Bar No. 006199
Alexandra Dawson, Bar No. 033003
Aaron Dawson, Bar No. 034951
DAWSON & ROSENTHAL, P.C.
7012 N. 18th Street
Phoenix, Arizona 85020
Telephone: (928) 282-3111
dandr@dawsonandrosenthal.com

*Attorneys for Plaintiff Steven P. Laitin, M.D.*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Steven P. Laitin, M.D., an individual,<br><br>　　Plaintiff,<br><br>　　vs.<br><br>Unum Group, a Delaware Corporation; Provident Life and Accident Insurance Company, a Tennessee Corporation,<br><br>　　Defendant. | CASE NO:<br><br>**COMPLAINT FOR DAMAGES & REQUEST FOR JURY TRIAL** |

Plaintiff, Steven P. Laitin, M.D. alleges as follows:

**I.　PARTIES, JURISDICTION AND VENUE**

1.　Plaintiff Steven P. Laitin, M.D. ("Dr. Laitin" or "Plaintiff") is a resident of Arizona residing in Phoenix, Arizona.

2.　Defendant Unum Group ("Unum Group") is a general business corporation organized under the laws of Delaware. Its corporate headquarters is located at 1 Fountain Square, Chattanooga, Tennessee. Unum Group also has corporate offices at 2211 Congress Street, Portland, Maine. Unum Group is licensed to do business in Arizona and is doing business within the District of Arizona. Unum acts as an insurance holding company under the insurance holding company acts of the various states, including Arizona, and under the holding company statutes Unum is the ultimate controlling person of Provident Life & Accident Insurance Company ("Provident"). Prior to changing its name to Unum Group in 2007, Unum

Group was known as UnumProvident Corporation. Before June 30, 1999, and its merger with Unum Life Insurance Company, the entity that is now known as Unum Group, and which became UnumProvident Corporation, was known as Provident Companies, Inc.

3. Provident Life and Accident Insurance Company ("Provident"), is a corporation organized and existing under the laws of Tennessee. Provident's corporate headquarters is located at 1 Fountain Square, Chattanooga, Tennessee. Provident sells insurance products, including life and disability insurance throughout the United States, including Arizona. Provident is licensed to do business, and does business, in all states, except New York.

4. Production activities related to insurance policies issued by Provident consist of underwriting and processing insurance policies and administering claims and handling various types of other activities related to Provident's insurance policies. These production activities are performed by employees of Unum Group. Plaintiff's Provident insurance policy at issue in this matter is part of what Unum has designated as the "closed block." Regarding claims Unum administers for its subsidiary insurers, including Provident, Unum uses the same claim handling practices and manages claims on an enterprise level.

5. Unum Group and Provident (collectively "Defendants") have intentionally availed themselves of the benefits and protections of Arizona. Unum and Provident operate their businesses within Arizona, maintaining and administering long-term disability insurance policies and claims in Arizona.

6. Defendants acted in concert and engaged in a joint venture for profit relating to marketing disability insurance and adjudicating the resulting claims, including adjudicating claims for Arizona residents. Therefore, Defendants are jointly and severally liable for the acts complained of herein, and the alleged conduct described in this Complaint is attributed to all Defendants.

7. Dr. Laitin's long-term disability insurance claim is not governed by or subject to the Employee Retirement Income Security Act of 1974.

8. There is complete diversity between the parties and, as alleged below, the amount in controversy exceeds $75,000.00. This Court has subject matter jurisdiction over the parties

1

pursuant to 28 U.S.C. § 1332(a)(1).

## II.  UNDERLYING FACTS

9.  Plaintiff incorporates the above allegations herein.

10.  In 1995, at the end of his anesthesiology residency at Standford University, Plaintiff purchased an individual disability insurance policy from Defendants, (Policy No. 06-338-5115761), referred to herein as the "Policy."

11.  The Policy was issued to Plaintiff pursuant to a Provident Conversion Insurance Enrollment Form. anesthesiology residency at Stanford University.

12.  Plaintiff has paid premiums for the Policy directly to Defendants at all relevant times herein.

13.  Stanford University has had no involvement in the administration of Plaintiff's Policy.

14.  The Policy was solicited, applied for, and issued and delivered in California.

15.  At all relevant times Dr. Steven Laitin was a board-certified anesthesiologist and fellowship-trained pain management specialist.

16.  For more than a decade, Plaintiff struggled with worsening degenerative lumbar spine disease, which caused him significant pain, and progressive left leg weakness. He continually modified his practice in an effort to accommodate these medical limitations, reducing hours, eliminating procedures, and ultimately confining himself to the least physically demanding aspects of his work.

17.  Despite the many modifications, by September of 2024, Dr. Laitin could no longer perform even the reduced duties of his occupation. He was 59 years old.

18.  Plaintiff provided notice of disability and claim to Defendants and submitted completed claim forms for benefits. Plaintiff provided overwhelming and convincing proof of his disability and inability to continue working in his regular occupation and in the usual and customary manner, including certifications from his treating physician, fully supporting Plaintiff's disability.

19.  Defendants denied the claim on April 3, 2025.

2

20. Defendants have unreasonably processed Plaintiff's claim, misrepresented Plaintiff's rights, and have wrongfully denied and withheld benefits owed under the Policy.

### A. Plaintiff's Disability Insurance Policy

21. At the time of Plaintiff's disability, the Policy provided a Monthly Benefit in the amount of $4,580.

22. At all material times hereto, Plaintiff was insured under the Policy, which obligates the UNUM Defendants to pay and provide monthly disability benefits in the event of a covered total, partial, and/or residual disability to age 65.

23. The Policy is non-cancellable and guaranteed continuable at guaranteed premiums until Plaintiff's 65th birthday. That is, as long as Plaintiff paid the premiums, the Policy would continue, and the premiums would not be increased.

24. The Policy contains a 90-day Elimination Period, after which monthly benefits will be paid.

25. Plaintiff satisfied and performed all terms and conditions required of him under the Policy.

26. The Policy defines "Total Disability" as sickness or injury that prevents the insured from being able to perform the material and substantial duties of Your Occupation; and you are receiving care by a Physician which is appropriate for the condition causing the disability.

27. Physician means any person other than you who is licensed by law, and is acting within the scope of the license, to treat Injuries or Sickness which results in covered loss.

28. The Policy defines "Sickness" as a sickness or disease which is first manifested while your policy is in force.

29. The Policy defines "Your occupation" as the occupation in which you are regularly engaged at the time you become disabled. If your occupation is limited to a recognized specialty within the scope of your degree or license, we will deem your specialty to be your occupation.

30. The Policy also provides benefits for Residual Disability.

31. Residual Disability means that due to Injuries or Sickness: 1. You are not able to do one or more of your substantial and material daily business duties or you are not able to do

3

your daily business duties for as much time as it would normally take you to do them; 2. You have a loss of Monthly Income in Your Occupation of at least 20%.

32. The Policy provides that after the Elimination Period has been satisfied, you are no longer required to have a loss of duties or time. Residual Disability or residually disabled then means that as a result of the same Injuries or Sickness you have a Loss of Monthly Income in Your Occupation of at least 20%.

33. The Policy also provides that nothing within the Residual Disability provision limits the policy definition of "Total Disability."

34. The Policy contains a Waiver of Premium provision that is triggered after the 90-day Elimination Period is satisfied. Pursuant to this provision, Provident will refund any premiums which became due and were paid while a claimant was totally and/or residually disabled and waive the payment of each premium which thereafter becomes due for as long as the period of disability lasts.

35. Under the Policy, industry standards, and applicable law, an insured is considered totally disabled under an occupational disability insurance policy if he is unable to perform with reasonable continuity the substantial and material acts necessary to pursue his usual occupation in the usual and customary way.

**B.     Plaintiff's Occupational Duties and Disabling Sickness**

36. Dr. Laitin worked as anesthesiologist and pain specialist in his pain clinic, in addition to the Banner and Metro Surgery Centers.

37. Dr. Laitin's occupation of anesthesiology is both physically and mentally demanding. His duties require the frequent movement and positioning of patients, necessitating significant physical exertion. These tasks routinely involve prolonged standing, bending, stretching, reaching, and twisting – all often performed while wearing a lead protective vest. Additionally, his role requires sustained concentration to safely administer and monitor anesthesia. The ability to consistently perform these material and substantial duties is vital to the safety of Plaintiff's patients.

38. As the anesthesiologist, Dr. Laitin had ultimate responsibility for patient safety,

4

including when the patient was transported.

39. Dr. Laitin's medical conditions, including lumbar stenosis, lumbar degenerative disc disease with radiculopathy, and Achilles tendinopathy caused severe pain in his lumbar spine and leg.

40. In addition to the pain he endured, Dr. Laitin experienced muscle spasms and weakness when he needed to bend, stand, or twist – which were required to manage a patient's airway.

41. Given the progressive nature of his disease, Dr. Laitin's disabling condition impacted his practice over the years. He found certain routine procedures impossible to perform, and new ones to take their place.

42. In 2020, Dr. Laitin discovered eye surgeries were less difficult with his limitations and began to focus on those by 2022.

43. In or around 2023, Dr. Laitin eventually had to limit Fridays as he could only do a half day.

44. Dr. Laitin's duties as an anesthesiologist continued to include transporting patients on a gurney, the need to frequently twist, bend, and hold awkward positions for prolonged periods, and responsibility for patient safety.

45. About 6 months before Dr. Laitin stopped completely, he had stopped taking new chronic patients and conducting independent medical exams as he could not complete full examinations. Despite his workarounds, Plaintiff fought through the significant pain in the last two years of his practice, maximizing pain management medication and lidocaine patches. At the end of the workday, Dr. Laitin had to stretch, rest, and ice his body the remainder of the day. There were days Plaintiff could not put on a sock or tie a shoe.

46. Plaintiff's imaging scans conducted in September 2023, revealed moderate to severe multilevel degenerative changes, including disc bulge, and severe foraminal stenosis, and facet hypertrophy.

47. Plaintiff's treating doctor, Dr. Mark Siegel, advised Plaintiff that he should never bend forward to perform examinations or procedures, including doing so to intubate a patient

5

or manage a patient's airway; that Plaintiff should not walk unless he is in complete control, meaning Plaintiff could not push a patient gurney. Additionally, Dr. Siegel told Plaintiff he cannot assist lifting a patient in any way, especially if and when the patient moves suddenly. Accordingly, Dr. Siegel advised Plaintiff to stop working altogether. Plaintiff's restrictions and limitations posed, and would continue to pose, a significant threat to himself and to his patients.

48. Dr. Laitin stopped working on September 20, 2024.

### C. Plaintiff's Claim for Benefits

49. On January 12, 2025, Plaintiff submitted a claim for Total Disability benefits.

50. On January 28, 2025, Dr. Siegel completed the Attending Physician Statement and certified Plaintiff's Total Disability.

51. Over the next few months, Plaintiff submitted additional documentation showing that he could not perform the substantial and material duties of his occupation. These included treating physician statements, MRIs, clinical records, and first-person narratives describing his limitations.

52. Defendants do not dispute Dr. Laitin's occupation as an anesthesiologist.

53. Defendants' vocational analysis found that an anesthesiologist must frequently stand, reach, aid positioning the patient, and must be ready to institute remedial measures.

54. Dr. Laitin also submitted a claim under a Guardian disability policy, which was nearly identical in form and content to the Provident policy. Guardian accepted the claim and has paid monthly benefits since September 2024.

55. Defendants only had information that *supported* the claim, including objective imaging scans that were consistent with Dr. Laitin's reported restrictions and limitations. Rather than evaluate the evidence objectively, Defendants sought to mitigate their financial exposure on Plaintiff's claim and find a basis to deny the claim.

56. On March 11, 2025, Defendants requested additional time to make a decision on Plaintiff's claim alleging the need for a paper medical reviewer.

57. Unum's medical reviewer disagreed with Plaintiff's treating doctor and "that the weight of the evidence does not support restrictions and limitations that preclude [him] from

6

performing the part-time demands of [his] occupation." The reviewer acknowledged that the "MRI findings correlate with reported symptoms and exam findings" but decided to focus instead on the perceived "low treatment intensity" and the observation that Plaintiff was "independent with activities of daily living" and capable of ambulating.

58. However, Plaintiff's ability to ambulate or engage in basic daily activities is not the standard for establishing Total Disability under the governing Policy. Plaintiff never claimed otherwise. Nor does the Policy contain any provision that conditions eligibility for benefits on the intensity of treatment or penalizes a claimant for declining invasive surgical options. Thus, the reviewer's analysis was legally and factually inadequate to warrant denial of benefits.

59. Despite the reviewer's findings that supported the presence of disabling symptoms, Defendants declined to accept the claim. Instead, they commissioned a second paper review, further demonstrating their ongoing effort to procure a basis for denial.

60. The second reviewer opined that, in the absence of full physical examinations from Plaintiff's provider related to back pain, even the "significant" imaging studies—showing degenerative changes and severe spinal canal and neural foraminal stenosis—did not support Plaintiff's claimed limitations. This conclusion ignores the weight of the objective evidence and underscores Defendants' predetermined intent to deny the claim irrespective of medical support.

61. Defendants overruled the opinion of Plaintiff's treating physician based on its own doctors' paper review of Plaintiff's medical file.

62. Defendants selectively used portions of Plaintiff's medical records to their own advantage, while discounting or disregarding the medical findings that supported disability.

63. Defendants mischaracterized Plaintiff's occupational duties in determining whether Plaintiff was disabled from performing with reasonable continuity the substantial and material duties of his own occupation.

64. Defendants misrepresented many of the material duties of Plaintiff's occupation. Rather than applying the known duties of Plaintiff's occupation, Defendants chose to make up fictional occupational duties, and continued to insist its made-up duties constituted the actual

material duties of Plaintiff's occupation, even after Plaintiff provided specific information about the duties of his occupation and a detailed explanation for those reasons in an effort to correct Defendants' occupational description.

65. Accordingly, Defendants failed to evaluate Plaintiff's claim in a fair and reasonable manner, instead engaging in a pattern of selective review and unsupported rationales in order to deny benefits rightfully owed under the Policy.

66. By letter dated April 3, 2025, the Unum Defendants wrongfully denied Plaintiff's claim for benefits, contending that its in-house physicians disagreed with Plaintiff's treating physicians. Defendants conducted no examination or meaningful evaluation of Plaintiff.. Further, when denying benefits to Plaintiff, the Unum Defendants repeatedly represented to Plaintiff that his Policy and claim were governed by ERISA rather than state law knowing Plaintiff's Policy and claim were *not* governed by ERISA.

67. Defendants' unreasonable claim handling practices set out in paragraphs 55-66 are consistent with its pattern and practice of wrongful claims handling practices that are designed to enhance their ability to increase claim denials and terminations.

68. The California Department of Insurance ("DOI") conducted an examination of Unum Defendants' practices and procedures, and concluded that Unum Defendants' practices and procedures constituted unfair business practices and that it operated its claims department in a manner wherein it sought to find reasons to justify a denial of a claim rather than to conduct a full, fair and thorough investigation of a claim.

69. On or about October 1, 2005, Unum Group and the DOI entered into a series of identical agreements with various Unum Group insurers, including Provident, identified as the California Settlement Agreement ("CSA"). These agreements were approved, authorized and ratified by Unum Group and each of its participating insurers.

70. Unum Group and its affiliated companies, including Provident, agreed to change specific practices they knew or had reason to know to be unfair, harmful to insureds and violative of their insureds' rights, but had nonetheless been employed by Unum Group and its affiliated companies to support the denial of legitimate claims.

71. It was the responsibility of Unum Group and its claims personnel to implement the changes agreed to under the CSA within and throughout Unum Group and its affiliated companies, including Provident.

72. Defendants have refused to comply with their agreement to not engage in specified improper claim practices, or alternatively have reverted back to deliberately operate the claims department in a manner intended to create a basis to deny disability claims and to increase profits at the expense of insureds. Many of the practices which Defendants agreed not to employ were, in fact, employed to deny Plaintiff's legitimate claim.

73. In an effort to avoid the application of state law applicable to its claims handling activities, Unum Group implemented a pattern and practice of misrepresenting to policyholders and claimants that their disability insurance policies and claims arising thereunder were governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), which Unum Group understood to preempt state law and the remedies available to Unum Group policyholders pursuant to state law.

74. To this end, Unum Group falsely stated in letters to policyholders and claimants that their disability insurance policies and claims were governed by ERISA in a manner to mislead insureds into believing ERISA would apply. Unum Group further created internal documentation, including documents titled or known as Case Summary Offer Forms, containing false and/or misleading information relative to the issuance of disability insurance policies in order to manufacture a false but plausibly-sounding justification for ERISA's applicability.

## III. CAUSES OF ACTION

### A.  Breach of Contract

75. Plaintiff incorporates by reference the preceding paragraphs herein.

76. Plaintiff had a contract for disability insurance with Defendants.

77. Plaintiff complied with every term of the Policy.

78. Plaintiff was eligible for benefits under the Policy.

9

79. Without just cause or excuse, Defendants have denied benefits due under the Policy.

**B.  Breach of Covenant of Good Faith and Fair Dealing (Bad Faith)**

80. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

81. Defendants have unreasonably denied payment of benefits due under the Policy without a reasonable basis and have unreasonably processed Plaintiff's claim.

82. In delaying and denying benefits to Plaintiff under his disability policies, Defendants knew that they were acting without a reasonable basis in their investigation and evaluation of the claim presented.

83. Defendants failed to conduct a reasonable investigation of Plaintiff's claim, and instead conducted an investigation that was outcome-focused on finding a plausible basis to deny Plaintiff's claim.

84. Defendants failed to objectively evaluate facts, including ignoring facts that supported Plaintiff's claim for disability benefits.

85. Defendants misrepresented facts that supported Plaintiff's claim.

86. Defendants intentionally misrepresented that Plaintiff must appeal the denial before bringing a civil action, governed by ERISA. They have been reprimanded for this conduct by the California Department of Insurance.

87. Defendants failed to give appropriate weight to the opinions of Plaintiff's treating doctor.

88. In all aspects of investigating or evaluating Plaintiff's claim for benefits, Defendants failed to give Plaintiff's interests at least as much consideration as their own and instead elevated their own interests above Dr. Laitin's.

89. Defendants have acted, and continue to act unreasonably, in relying on non-treating and non-examining personnel who do not qualify to render medical opinions regarding Plaintiff, and have acted and continue to act unreasonably by denying Plaintiff's claim without a medical foundation to do so.

90. Defendants purposefully ignored information by Plaintiff's qualified treating physician, and instead placed their own interests ahead of Plaintiff's in order to deny Plaintiff's

10

claim.

91. Defendants have acted and continue to act unreasonably by denying Plaintiff's benefits and maintaining that denial without a reasonable basis for doing so.

92. Through the unreasonable, intentional, and wrongful handling of Plaintiff's claim and denial of his disability benefits, Defendants have irrevocably strained the insurer-insured relationship and destroyed the security and peace of mind that Plaintiff bargained for when he purchased the Policy.

93. Defendants engaged in these improper acts knowing and consciously disregarding that they carried a substantial risk of significant harm to Plaintiff.

94. Defendants denied Plaintiff's benefits knowing that Plaintiff's claim was valid and payable.

95. Defendants' bad-faith claims handling and claims decision were the product of long-standing company policies designed to influence claim outcomes to benefit Defendants' financial interests at the expense of claimants like Dr. Laitin.

## IV. PRAYER FOR RELIEF

96. At all times herein, Defendants were acting in concert and in furtherance of a joint enterprise and therefore each is directly, and jointly and severally liable for the damages and harm inflicted on the Plaintiff. Plaintiff requests a trial by Jury, and seeks damages against Defendants, jointly and severally, as follows:

   a. An award of past policy benefits and prejudgment interest as damages for Defendants' breach of the insurance contract;

   b. An award of past and future damages based on the value of benefits that would be received throughout Plaintiff's life pursuant to the Policy, as damages for Defendant's breach of the obligation of good faith and fair dealing;

   c. An award of past, present, and future damages for physical suffering, emotional distress, humiliation, inconvenience, and anxiety as a result of Defendants' breach of the obligation of good faith and fair dealing, as previously set forth herein;

   d. Reasonable attorneys' fees pursuant to A.R.S. § 12-341.01, and taxable costs;

11

e.  Punitive damages assessed against each Defendant in an amount sufficient to punish and deter the conduct described herein;

f.  Interest on the liquidated amounts at the highest rate permitted by law; and

g.  Such other relief as may be provided by law.

## V. TRIAL BY JURY

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands trial by jury.

DATED this August 4, 2025.

> DAWSON & ROSENTHAL
>
> */s/ Steven C. Dawson*
>
> Steven C. Dawson
> Anita Rosenthal
> Alexandra Dawson
> Aaron Dawson
>
> *Attorneys for Plaintiff Steven P. Laitin, M.D.*